**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/10/2023
```

| | |
|---|---|
| SYNCX LLC, f/k/a MSP SYNCHRONIZED SOLUTIONS, LLC, | **23 Civ. 5070 (VM)** |
| Plaintiff, | **DECISION AND ORDER** |
| - against - | |
| KIMEDICS, INC., | |
| Defendant. | |

**VICTOR MARRERO, United States District Judge.**

Plaintiff Syncx LLC f/k/a MSP Synchronized Solutions ("Syncx") filed this action against defendant Kimedics, Inc. ("Kimedics") for breach of contract and declaratory relief and seeks a preliminary injunction to enjoin Kimedics from using certain data and from contacting certain Syncx clients. Kimedics filed counterclaims for breach of contract and deceptive trade practices. Kimedics also seeks a preliminary injunction restricting Syncx's ability to use and advertise software that Syncx developed and that Kimedics claims misappropriates both Kimedics's goodwill and proprietary technology. Before the Court are the parties' dueling motions for injunctive relief. For the reasons set forth below, the Court **DENIES** both parties' motions.

1

## I.   **BACKGROUND**

A.   FACTUAL BACKGROUND[1]

1.   The Parties

Syncx (pronounced Sync-Ex) is a Delaware limited liability company and a Managed Services Provider ("MSP") in the healthcare industry. Syncx focuses on administering hospital systems' temporary workforce, including the hiring of doctors and other practitioners on a temporary basis. These healthcare providers and professionals are known in the industry as "locum tenens" or "locums." Syncx's services include sourcing, hiring, staffing, billing, and facilitating payment to the practitioners filling these temporary positions. Syncx was initially named MSP Synchronized

---

[1] Except as otherwise noted, the factual background described below derives from the facts as set forth by the parties in the Complaint (Dkt. No. 1), the Counterclaims (Dkt. No. 28), and the papers and accompanying declarations and exhibits provided in support of the Motions. These include the Declarations of Kimo Peluso, Melissa Byington, and Jason Bodie offered in support of Syncx's Motion and in opposition to Kimedics's Motion (see "Peluso Decl.," Dkt. No. 10; "Shaener Decl.," Dkt. No. 11; "Byington Decl.," Dkt. No. 12; "Peluso Opp. Decl.", Dkt. No. 39; "Shaener Opp. Decl.," Dkt. No. 40; "Byington Opp. Decl.," Dkt. No. 41; "Bodie Opp. Decl.," Dkt. No. 42; "Shaener Suppl. Decl.," Dkt. No. 44) and the declarations of Daniel Hancock and Sarah Ramsey offered in support of Kimedics's Motion and in opposition to Syncx's Motion (see "Ramsey Opp. Decl.," Dkt. No. 33; "Hancock Opp. Decl.," Dkt. No. 34; "Ramsey Suppl. Decl.," Dkt. No. 47). No further citations to these documents will be made herein except as specifically referenced. The Court construes any disputed facts discussed in this section as required under the standard set forth in Section II.

Solutions, LLC until February 2023 when it rebranded to Syncx, LLC.

Syncx's LLC is managed by two members, Quest Healthcare, LLC ("Quest") and Velo Source, LLC ("Velo Source"). Quest's sole member is Quest Group Search, LLC. The managing members of Syncx are citizens of Georgia, Colorado, Missouri, New Hampshire, Louisiana, and Florida. Doug Shaener ("Shaener") is an executive at Quest and Patrick Donovan ("Donovan") is an executive at Velo Source. Shaener and Donovan are also executives at Syncx. Syncx's CEO is Melissa Byington ("Byington").

Kimedics is a Delaware corporation with its principal place of business in Tennessee. It was founded in 2018 by its CEO, Sarah Ramsey. Kimedics provides a business-to-business software-as-a-service workforce management solution it calls the Kimedics Platform (or "Platform"). Like Syncx, Kimedics operates primarily in the healthcare industry helping its clients manage healthcare staffing and business issues like roster management, applicant tracking, onboarding workflows, rate management, vendor management, float pool management, timesheets, invoicing, and analytics. It describes itself as a "single software workforce management solution to manage and collaborate with individual healthcare providers, institutional health care employers and service providers,

and providers of healthcare staffing services and other vendor services." ("Counterclaims," Dkt. No. 28 ¶ 7.)

Kimedics characterizes itself as a disruptor in the industry and its CEO as a visionary. According to Kimedics, the Platform is a "one of a kind platform" (Tr. 30:19) allowing parties from disparate parts of the industry -- third-party providers, healthcare providers, vendors, and other healthcare industry professionals -- to seamlessly connect in an "agnostic virtual marketplace." (Tr. 31:2.)

2. Syncx Contracts with Kimedics

Shortly after its founding in mid-2020, Syncx was looking for a technology solution on which to build its locums staffing business. There were many options to choose from, including from other companies in the industry like AMN Health Care, Ringo, Locumsmart (CHG), Healthcare Workforce Logistics, Right Sourcing, and others. Because the locums staffing business is highly competitive and the market is crowded, Syncx preferred to contract with a company that would not be competitive with Syncx for the type of business it was seeking to administer; that is, large healthcare organizations with thousands of employees and multiple locations. Shaener was already familiar with the Kimedics Platform through Quest, having been invited to collaborate on

it by another Kimedics customer earlier on. Eventually, Syncx chose Kimedics to serve as its software solution.

In July 2020, Syncx and Kimedics entered into the Master Services Agreement ("MSA") and an MSA Order Form. The MSA Order Form would be amended a year and a half later, in December 2021 by Amendment No. 1 ("Amendment") (the MSA, MSA Order Form, and Amendment are collectively referred to as the "Agreements" or the "Agreement"). The Agreements governed the entirety of the relationship between Syncx and Kimedics.

The Agreements granted Syncx a limited and non-exclusive right to access the Kimedics Platform and provide the services that the Kimedics Platform offers (the "Kimedics Services") to its customers. In exchange, Syncx would pay fees to Kimedics for this access. The MSA defined the Kimedics Services as "the particular modules of the [Kimedics] Platform that, as of the relevant time, [Syncx] has contracted for in applicable Order Form, and the particular Professional Services that, as of the relevant time, [Syncx] has contracted for from time to time in an applicable [Statement of Work]." ("Shaener Decl.," Dkt. No. 11, Ex. 1 at 2 (hereinafter, the "MSA").) The MSA Order Form further defines the types of modules that Syncx was contracting for and the fees. (See Shaener Decl. Ex. 2.)

The Agreements had a defined term of 36 months per the MSA Order Form. (See MSA § 3.1 ("The term of this Agreement will begin on the Effective Date and continue until the later of . . . the expiration or termination of all Order Forms and/or [Statements of Work]."), Shaener Decl. Ex. 2 ("MSA Order Form") § 1.4 (defining the initial order term as 36 months).)

The MSA also provided that the Agreements would terminate in the event of a material breach. Pursuant to Section 3.2 of the MSA, either party could "terminate this Agreement and/or any or all Order Forms and [Statements of Work] in the event that the other party (i) is in material breach of this Agreement . . . and such material breach, if capable of being cured, has not been cured within 30 days following receipt by the breaching party of written notice from the non-breaching party of such breach." (Id. § 3.2.)

As relevant to this dispute, the Agreement also provided for protection of each party's data and intellectual property. Section 2 of the MSA states that Syncx "(or its Clients [defined as 'any healthcare organization for whom [Syncx] is providing managed services']) owns, and shall retain all right, title and interest in and to all Customer Data." (Id. § 2.1.) Customer Data is further defined in the MSA as "all data, material and other information, in each

6

case other than Provider Data, that is (i) entered or uploaded into the Kimedics Account by [Syncx], an authorized Affiliate or Client of [Syncx] or their Authorized Users, or (ii) imported into the Kimedics Account, or connected to through the Kimedics Account, from any Connected Services." (Id. § 1.)[2]

Through the MSA, Syncx granted Kimedics a right "during the Term" to "copy, cache, store, reproduce, process, display, use, distribute, transmit and generally make available Customer Data in electronic form through the Platform solely in order to provide the Kimedics Services to [Syncx] and/or [Syncx's] authorized Affiliates or Clients," and to "access Customer Data on the Connected Services solely in order to provide the Kimedics Services." (Id. § 2.5.)

Kimedics also received broad protections for Kimedics Services and Data . The MSA provides that Kimedics was the "sole and exclusive owner of, and shall retain, all right, title and interest in and to all Kimedics Data." (Id. § 2.2.) Kimedics Data is broadly defined by the MSA as "all data,

---

[2] Kimedics Account is defined as the "password restricted account to access and use the [Kimedics] Platform"; Affiliate is defined to include an entity under control of either Syncx or Kimedics; Authorized User is defined as "an individual user who is an employee, independent contractor or other service provider of [Syncx] or an authorized Affiliate or Client of [Syncx]" authorized to use the Kimedics Services for internal use only; and Connected Services means "any third-party services supported by the [Kimedics] Platform that [Syncx] elects to, and has provided Kimedics with [authorization] to connect through the Platform." (MSA § 1.)

material, documentation, source code, object code, underlying structure, ideas, algorithms, and other information comprising the [Kimedics] Platform, the User Guides, the Professional Services and the Performance Data, and all Intellectual Property Rights in each of the foregoing, but specifically excluding all Customer Data and Provider Data." (Id. § 1.)

To further protect the Kimedics Data, Syncx was restricted from providing "access to the Kimedics Services to any Affiliate of [Syncx] who Kimedics determines, in its sole discretion, is a direct competitor of Kimedics in providing software services that provide services that are substantially similar to the Kimedics Services accessed and utilized by Customer." (Id. § 2.4.)

Syncx was also prohibited from leveraging its access to aspects of the Kimedics Platform to create its own competitive product.

> None of [Syncx], any Affiliate of [Syncx] or any of its or their Authorized Users shall, directly or indirectly (i) misappropriate or infringe any of Kimedics' Intellectual Property or any other ownership rights in any Kimedics Data, (ii) reverse engineer, decompile, disassemble, disclose or otherwise attempt to discovery the source code, object code or underlying structure, ideas or algorithms of the [Kimedics] Platform; (iii) modify translate or create derivative works based on any Kimedics Data; . . . or (v) **use the Kimedics Data for the purposes of developing, directly or indirectly, any product or service competitive to the [Kimedics] Platform**.

(Id. § 2.6 (emphasis added).) Under this provision, the parties agreed that Kimedics would be entitled to injunctive relief in the event of a breach. (Id.)

The MSA also included protections for the use and access to each parties' confidential information, providing that each party would "hold the Confidential Information of the other Party in strict confidence." (Id. § 8.2.) Confidential Information was also broadly defined. Its definition included "business or technical information, data, or know-how, whether or not a statutory 'trade secret', including, but not limited to, that which related to product plans, designs, source code, software, Intellectual Property, marketing plans, business opportunities, personnel, research, developments, processes, designs, drawings, engineering, product pricing, financial information, third-party confidential information and other sensitive or proprietary information, in whatever form." (Id. § 8.1.)

Confidential Information, however, excluded any information that, in pertinent part, "(i) is or becomes generally available to the public . . . (ii) is already known by the receiving party, by means not subject to a confidentiality obligation owed to the disclosing party . . . or (iv) is developed independently by the receiving party without use of any of the disclosing party's Confidential

9

Information by persons without access to such Confidential Information." (Id.) The parties agreed that injunctive relief would be presumed in the event of a disclosure or threatened disclosure of one another's Confidential Information. (Id. § 8.4.)

### 3.   The Relationship Sours

According to Kimedics, Syncx had negotiated for a much more one-sided deal. During the negotiations over the MSA, Syncx sought to be the exclusive MSP able to operate on the Kimedics Platform. In other words, Syncx sought to limit the ability of other competitors in the managed services industry to compete with the complete staffing solution Syncx could offer once it partnered with Kimedics. Kimedics rejected Syncx's request for exclusivity because doing so would limit the collaborative open-market place functionality of the Kimedics Platform.

In September 2020, shortly after the MSA was executed, Syncx, still a new venture at the time, re-approached Kimedics regarding an amendment to the MSA to further carve out Syncx's place in the locums staffing market. Syncx sought to protect its clients and vendors by limiting Kimedics's ability to directly communicate with certain third parties. In an email dated September 9, 2020, Shaener asked Ramsey about including "non-circumvent language" in the MSA. (See Ramsey Opp. Decl.

Ex. 1.) The additional language would prohibit Kimedics during the initial term of the Agreements "and for a period of two (2) years after" from "attempt[ing] to do business with, do[ing] business with, or otherwise solicit[ing] any customers or other business contacts found, introduced, or referred by [Syncx], whether for the purpose of circumventing a relationship established by [Syncx] (whether developed jointly with Kimedics after introduction or referral by [Syncx] or developed solely by [Syncx] or otherwise." (See Ramsey Opp. Decl. Ex. 2.) Kimedics rejected the proposed language.

In February of 2021, Syncx sought to acquire Kimedics. Syncx approached Kimedics about the potential for purchasing Kimedics, apparently to fulfill its goal of exclusivity. Kimedics alleges that it shared with Syncx significant Confidential Information, as that term is defined by the MSA, as part of the acquisition due diligence, including a comparison of the Kimedics Platform's functionality to other platforms in the marketplace. (See Ramsey Suppl. Decl. Ex. 2.) The deal never materialized.

Syncx also sought to extract other concessions from Kimedics. Syncx promised one of its two clients, the University of Pittsburgh Medical Center ("UPMC"), without Kimedics's consent or authorization, that Syncx could provide

11

a mobile application with all of the functionality of the
Kimedics Platform. Syncx and Kimedics eventually drew up an
order form for the app and Kimedics spent substantial
resources designing the mobile application for Syncx's
client.

Then, just prior to when the application for UPMC would
"go live," Kimedics was contacted by another agency active on
the Kimedics Platform. (See Counterclaims ¶ 46.) That agency
expressed concern over a contractual provision in an
agreement the agency had with Syncx. Kimedics learned that
Syncx had inserted non-circumvention language into more than
25 vendor contracts with staffing agencies that operate on
the Kimedics Platform, which limited those agencies' ability
to communicate with Kimedics. Syncx, at the time, told
Kimedics that the language was "nothing to worry about," but
Kimedics alleges that, in later meetings with Syncx's outside
counsel, Syncx's attorneys conceded that such a restrictive
provision existed. (Id. ¶¶ 47-48.) According to Kimedics,
Syncx lied and added the language to prevent those customers
from contacting Kimedics because it was unable to contract
for MSP exclusivity with Kimedics.

Kimedics also alleges that around the same time, Syncx
posted screenshots of Kimedics's Confidential Information on
Syncx's website and in a LinkedIn post without Kimedics's

permission. To protect how the Kimedics Platform operates, Kimedics does not allow anyone to see the Platform, and how it operates, without first agreeing to its user agreement. (See Tr. 31:17-19.) In other words, by posting screenshots of the Kimedics Platform, Syncx had allowed the public unauthorized access to see under the hood and understand what differentiates the Kimedics Platform from its competitors.

These events precipitated the Amendment of the MSA Order Form to reset the parties' expectations. To appease Syncx's desire for increased exclusivity, the parties first categorized the types of clients and users of the Kimedics Platform into two groups: Kimedics Exclusive Clients and Unrestricted Parties. A Kimedics Exclusive Client was defined as "[a]ny Healthcare Organization that (a) has entered into an MSP Exclusive Contract, (b) with respect to whom [Syncx] is utilizing the Platform, and (c) as of any date of determination, has in the prior 12-month period generated at least $30,000 of Platform Fees to Kimedics." (Shaener Decl. Ex. 3 § 1.10 (hereinafter, "Amendment").) An Unrestricted Party was defined as anyone who was not a Kimedics Exclusive Client.

To assuage concerns that Syncx would try to limit Kimedics's ability to communicate with certain third-parties like vendors and staffing agencies, the Amendment prohibited

Syncx from "restrict[ing] any Unrestricted Party's ability to use or access the Platform or otherwise interfere with Kimedics's ability to engage in any potential business relationship with any Unrestricted Party, including by imposing or enforcing contractual restrictions on any Unrestricted Party with respect to Kimedics." (Amendment § 4.3.)

And to limit Kimedics's ability to compete with Syncx over Syncx's most important customers, Kimedics was prohibited from "actively encourag[ing] any Person who is a current Kimedics Exclusive Client to terminate or adversely alter its relationship with [Syncx] or (b) solicit or directly engage any current Kimedics Exclusive Client for Kimedics' direct provision of any Synchronized Services, in each case, for the duration of the period [] commencing on the date that [Syncx] enters in to the applicable MSP Exclusive Contract and ending on the earliest to occur of (1) the date that is 18-months after the MSP Exclusive Contract is terminated, and (2) the date that is 18-months after the date that this Order Form is terminated." (Id. § 4.4.)

To avoid Syncx burdening Kimedics with undue requests (like that involving the UPMC mobile app), Syncx agreed to "not make any representation or warranty to any Person regarding the Platform" without "prior written consent of

Kimedics." (Id. § 4.6.) Syncx also agreed not to make promises
to clients about "features or functionality that do not
currently exist in the Platform." (Id.)

Finally, because Kimedics was concerned that, through
the screenshots that Syncx had posted, Syncx had represented
in public that its partnered software solution with Kimedics
was Syncx's, Kimedics requested and the parties agreed to
include language that prohibited Syncx from representing that
"the Platform or any Kimedics Services are owned by, or
otherwise the exclusive technology of, [Syncx], including but
not limited to, any statements or claims that the Platform or
any Kimedics Services are the proprietary technology of
[Syncx]." (Id. § 4.7.)

### 4.   Syncx Develops Its Own Software Solution

In or around late-2021 or early-2022, Syncx began
developing its own software as a response for the souring of
its relationship with Kimedics and perceived limitations of
the Kimedics software. Syncx had determined that its
relationship with Kimedics was no longer viable and that
developing its own software could allow it to better serve
its clients with increased functionality. Syncx engaged the
Nuage Group LLC ("Nuage") on a work-for-hire basis to develop
a Salesforce-based platform to run Syncx's managed services
applications.

Syncx's new platform (the "Syncx Software") was designed by Nuage in collaboration with several stakeholders from Syncx, including Byington, Shaener, and Donovan. The Syncx Software uses open-source code for its calendaring and scheduling functions, which were further customized by Nuage to fit Syncx's needs. Nuage spent more than 5,000 hours developing the Syncx Software.

### 5.   The Syncx/Kimedics Relationship Ends

On April 28, 2023, Byington called Ramsey to tell Ramsey that Syncx would not renew its contract with Kimedics when the term ended on July 10, 2023. According to Kimedics, during that call Byington told Ramsey that Syncx had created and intended to bring to market the Syncx Software but did not say that the Syncx Software would offer similar functions and user experience as the Kimedics Platform. Rather, Byington told Ramsey only that Syncx would use Salesforce to provide some of the functionality that Kimedics had been providing.

Four days later, Byington emailed Ramsey to further confirm that Syncx would not be renewing its contract with Kimedics and provided a copy of the notice. The email noted that Syncx would "plan to terminate effective July 11th, as outlined in the contract." (Byington Decl. Ex. 1.)

On May 9, 2023, Ramsey responded to Byington's email confirming the non-renewal, effective as of July 11, 2023.

Ramsey reminded Byington of Syncx's obligations under Sections 2.6 of the MSA and Amendment Section 4.7, relating to use of Kimedics Data to develop competing software and to passing off Kimedics's services as Syncx's own, respectively.

Later in May, Kimedics became aware of a press release, product demo, case study, and LinkedIn post, in which Syncx publicized the Syncx Software as part of its rebrand from MSP Synchronized Services to Syncx. Kimedics alleges that it then learned that the Syncx Software replicated many features of the Kimedics Platform that differentiate it among its competitors, including, specifically the "integrated vendor management, scheduling, and float pool functionality that is a key market differentiator."[3] (Counterclaims ¶ 62.) Kimedics avers that these features are "built upon Kimedics's unique ideas, uses Kimedics Data, and uses Kimedics's Confidential Information regarding how such systems operate, how they are structured, and how they can be leveraged to provide value and savings to healthcare providers." (Id. ¶ 64.)

Kimedics also became aware of a case study in which Syncx promoted its success with UPMC. In the promotional material

---

[3] Kimedics also alleges the Syncx Software copies "providing a platform for managing both internal and external staff for float pool management; organization-wide views of providers by specialty, privileges and availability; and using the same data framework and organization structure, schedule builder implementation, organization-wide open shift and availability management, shift status designations, terminology, and granular connections between schedule and rate." (Counterclaims ¶ 61.)

for the case study, Syncx wrote, "In October of 2021, UPMC re-launched its internal locum float pool, this time on the Syncx Float Pool platform. With Syncx proprietary software, the process became automated, streamlined, and intuitive, allowing for an organization-wide view of available physicians and their locations." (Counterclaims ¶ 68 & Ex. 5.)

On June 5, 2023, Byington emailed Ramsey to remind her of Kimedics's obligations under the Amendment to not contact or solicit certain of Syncx's clients. But this was not the first time that Syncx understood Kimedics had contacted its client. According to Byington, in April 2023, Kimedics had conducted surveys with certain of Syncx's clients. Then, in another example, on June 2, 2023, Ramsey wrote directly to an administrator at UPMC that she wanted "to reach out to make sure you have a direct line to connect if there is anything at all your organization needs in the upcoming couple of months. Please do not hesitate to reach out at any time – feel free to text or call me [] or you can also schedule a meeting with me here if you need anything." (Byington Decl. ¶ 23.)

This June 2 email was the impetus for Byington's email to Ramsey, reminding her of Kimedics's agreement to not solicit or encourage any current Kimedics Exclusive Clients

from terminating their relationship with Syncx, citing Section 4.4 of the Amendment. (See Byington Decl. Ex. 3.)

Then, on June 8, 2023, Kimedics's outside counsel at Fultz Maddox Dickens PLC sent Syncx a letter terminating the Agreements "effective immediately," and simultaneously cutting off Syncx's access to the Kimedics Platform. (See Byington Decl. Ex. 4.) In that letter, Kimedics accused Syncx of having "misappropriated and us[ing] Intellectual Property belonging to Kimedics to prepare and market a product intended to directly compete with Kimedics." (Id. at 1.) Kimedics stated that these actions constituted material breaches of Sections 2.6 and 8 of the MSA, and Section 3.6, 4.6, and 4.7 of the MSA Order Form and Amendment and that "these breaches are incapable of cure." (Id.) Kimedics informed Syncx that it was shutting off Syncx's access to the Kimedics Platform but that it would continue to directly service Syncx's customers until July 11, 2023.

Syncx claims that its business was disrupted once it was shut out of the Kimedics Platform. Specifically, Syncx alleges that it was blocked from accessing reports that Kimedics created as well as its customer's data and analytics tools. Syncx's lawyers and Kimedics's engaged in talks regarding Syncx's access over the next several days, resulting in Kimedics's partially restoring Syncx's access to

certain parts of the Kimedics Platform that would allow Syncx to services its customers but that would not give them the full access they once enjoyed. But Syncx's customers had already been affected. Syncx could not access any of its data and so could not confirm medical providers' schedules, manage staffing needs, or invoice its customers. Syncx thus had to employ manual workarounds to service its clients. Even after Kimedics restored partial access, Syncx could not efficiently manage its business. Syncx contends that, to mitigate the damage to Syncx's relationship with its clients, it accelerated the rollout of the Syncx Software, causing it to incur additional expenses from Nuage.

6.   The Post-Termination Transition Period

Once Kimedics had shut off Syncx's access, Kimedics contacted other of Syncx's clients. On June 8, 2023, the same night that Kimedics locked Syncx out of the Platform, Ramsey emailed numerous employees of Syncx's clients and vendors to inform them that Kimedics had terminated its relationship with Syncx. In that email, Kimedics told those clients that Kimedics would be arranging for "elevated support" to help those entities' teams "during this transition." (Byington Decl. ¶ 46.) Syncx posits that Kimedics was able to contact these clients and vendors only because Syncx uploaded that contact information into the Kimedics Platform, making it

Customer Data, as defined under the Agreements. Syncx represents that at least some of those communications from Ramsey were sent to Kimedics Exclusive Clients, and thus Kimedics's offer to directly provide services that Syncx had provided, such as the offer for elevator support and, as described later, to generate invoices, violated Section 4.4 of the Amendment.

Syncx maintains that its relationships with clients became vulnerable after Kimedics cut off Syncx's access. For instance, Byron Wade ("Wade"), an administrator at UPMC, emailed Ramsey to illustrate the business disruptions that Kimedics's actions had caused. Wade explained that the "decision by Kimedics to suspend Syncx's access to the platform [was] causing serious, systemwide problems." (Byington Decl. ¶ 39.) Further, according to Syncx, other of Syncx's clients have put Syncx on notice that Syncx was in breach of Syncx's contracts by it not being able to timely deliver certain services.

On June 12, Kimedics's outside counsel replied to Wade's email, offering to provide data to UPMC so that it could run its own invoicing, a process previously carried out by Syncx. Kimedics's counsel also offered UPMC continued access to the Platform through July 11, 2023, which Syncx characterizes as

a 30-day free trial and a predatory move to squeeze Syncx out of the business. Days later, Syncx filed the instant lawsuit.

B.   PROCEDURAL HISTORY

Syncx filed its complaint ("Complaint," Dkt. No. 1) on June 15, 2023. After Kimedics accepted service on June 21, 2023, Syncx submitted a Proposed Order to Show Cause *Without* Emergency Relief. (See "Syncx OSC," Dkt. No. 8.) Along with the Syncx OSC, Syncx filed its Motion for Preliminary Injunction and supporting brief (see "Syncx Mot.," Dkt. No. 9, "Syncx Opening Br.," Dkt. No. 13), the declaration of Syncx Attorney, Kimo Peluso ("Peluso") (see "Peluso Decl.," Dkt. No. 10), and the declarations of Syncx executives, Doug Shaener ("Shaener") and Melissa Byington ("Byington") (see "Shaener Decl."; "Byington Decl.," Dkt. No. 12.)

The day after Syncx's Motion was filed, both parties submitted letters to the Court stating their respective positions on scheduling. Syncx sought expedited briefing and a schedule that would allow the Court to hear its Motion by June 30, 2023. (See Dkt. No. 14.) Kimedics advised the Court that it would be filing its own motion for a preliminary injunction, along with an answer to Syncx's Complaint and counterclaims against Syncx and sought to have the Court hear both motions contemporaneously. (See Dkt. No. 15.)

The parties reached a compromise and submitted a proposed stipulation and temporary restraining order on consent, which the Court adopted. (See "TRO," Dkt. No. 20.) The TRO restricted Kimedics from communicating with Syncx's two largest clients, UPMC and OSF Healthcare ("OSF") and required Kimedics to terminate access to data on its platform for UPMC and OSF employees, and to not share certain defined data[4] without Syncx's express consent. Kimedics agreed that these restraints would remain in place beyond the 14-day period set forth in Rule 65(b)(2) of the Federal Rules of Civil Procedure.

After entering the TRO, the Court set a briefing schedule on Syncx's Motion, directing the parties that briefing on that Motion would be complete by July 14, 2023. Kimedics filed its Opposition to Syncx's Motion (see "Kimedics Opp.," Dkt. No. 32) with the accompanying declarations of Kimedics CEO,

---

[4] The TRO defined "Plaintiff Data" as any "data on [Syncx's] account on Defendant Kimedics's software platform that was entered or uploaded onto the platform by [Syncx], by [Syncx's] clients, by [Syncx's] affiliates Quest Healthcare, LLC or Velo Source, LLC, or by [Syncx's] authorized users of [Kimedics's] platform, or that was imported into Syncx's account on the platform through any authorized third-party service supported by the platform. 'Plaintiff Data' does not include: (i) any personal or professional data, material, or other information relating to or connected with any physician, nurse, mid-level provider or other service provider managed in the Kimedics software platform (which includes, but is not limited to, any state license information, work experience, education, board specialty, or certification information); or (ii) any non-personal, aggregated/anonymized data derived from the operation and use of the software platform or other services provided by Defendant by Plaintiff, its clients, its affiliates, or its authorized users." (TRO ¶ 3.)

Sarah Ramsey ("Ramsey") (see "Ramsey Opp. Decl.," Dkt. No. 33) and Kimedics's attorney, Daniel Hancock (see "Hancock Opp. Decl.," Dkt. No. 34). Syncx filed its Reply (see "Syncx Reply," Dkt. No. 43) with a supplemental declaration from Shaener (see "Shaener Suppl. Decl.," Dkt. No. 44).

Amidst briefing Syncx's Motion, Kimedics filed its Answer and Counterclaims (see "Kimedics Answer" or "Counterclaims," Dkt. No. 28) as well as its own Proposed Order to Show Cause why a preliminary injunction should not issue, again *without* emergency relief. (See "Kimedics OSC," Dkt. No. 30.) Kimedics also filed its motion for a preliminary injunction (see "Kimedics Mot.," Dkt. No. 29) and its accompanying brief (see "Kimedics Opening Br.," Dkt. No. 31). Via email to the Court, the parties could not agree on a briefing schedule for Kimedics's motion. So, the Court entered a briefing schedule on par with that ordered for Syncx's Motion, briefing to be complete by July 21, and set a date for a hearing on both motions for July 28, 2023. (See Dkt. No. 36.)

Syncx opposed Kimedics's Motion (see "Syncx Opp.," Dkt. No. 38) and filed supporting declarations from Peluso, Shaener, Byington, and Jason Bodie, the president of Nuage, the company Syncx engaged to develop the Syncx Software (see "Peluso Opp. Decl.," Dkt. No. 39; "Shaener Opp. Decl.," Dkt.

No. 40; "Byington Opp. Decl.," Dkt. No. 41; "Bodie Opp. Decl.," Dkt. No. 42). Finally, Kimedics filed its Reply in support of its motion (see "Kimedics Reply," Dkt. No. 46) with another supporting declaration from Ramsey (see "Ramsey Suppl. Decl.," Dkt. No. 47).

On the same day that the Kimedics Reply was filed, Syncx also submitted its Answer to the Counterclaims. (See "Syncx Answer," Dkt. No. 48.)

The Court held argument on both Motions on July 28, 2023. In the week leading up to the hearing, the parties emailed the Court requesting clarification on whether the hearing would be a full-fledged evidentiary hearing, with new evidence and live witnesses. The Court responded that it would limit the proceeding to the papers and evidence submitted along with the parties' respective motions. Neither party raised any objections to that determination prior to the hearing.[5]

---

[5] At the hearing, Kimedics presented some evidence that was outside of the papers and submissions filed, to which Syncx objected. (See Tr. 38:18-21.) The Court confirmed on the record both parties' views that the record on which the Court would rule was sufficient and complete despite not holding a full-fledged evidentiary hearing. (See Tr. 60:2-3 (Syncx confirming that "the record is complete and sufficient for the Court to rule on"); 61:7-13 (Kimedics confirming that the record was adequate "[i]f the Court takes notice of the two demos [of Kimedics's software] showing that they're similar [to Syncx's]").); see also Clark v. Childs, 416 F. Supp. 3d 221, 222 (E.D.N.Y. 2017) ("[E]videntiary hearings on motions for temporary restraining orders and preliminary injunctions are not required."); Drywall Tapers & Pointers of Greater N.Y., Local 1974 v. Local 530, 954 F.2d 69, 76-77 (2d Cir. 1992) (evidentiary hearing not required where the "prior hearings and affidavits . . . provide[] an adequate basis for the court's decision"); Redac Project 6426, Inc. v.

## II.   <u>LEGAL STANDARD</u>

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." <u>Grand River Enter. Six Nations, Ltd. v. Pryor</u>, 481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (internal quotation marks omitted). A party seeking a preliminary injunction must demonstrate "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." <u>Faiveley Transport Malmo AB v. Wabtec Corp.</u>, 559 F.3d 110, 116 (2d Cir. 2009) (citation and internal quotation marks omitted).

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." <u>Id.</u> (internal quotation marks omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but

---

<u>Allstate Ins. Co.</u>, 402 F.2d 789, 790 (2d Cir. 1968) ("[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it."). Nevertheless, the Court notices the demonstrations displayed during July 28, 2023 hearing as part of the evidentiary record for these Motions.

actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). The movant must further show that the injury "cannot be remedied by an award of monetary damages." Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999).

Failure to demonstrate any of the above factors is fatal to the request for relief. See Victoria v. Sammy's Fishbox Realty Co., No. 14 Civ. 8678, 2014 WL 7180220, at *4 (S.D.N.Y. Dec. 12, 2014).

"When considering a motion for a preliminary injunction, unlike a motion to dismiss, the Court need not accept as true the well-pleaded allegations in Plaintiff['s] complaint" or counterclaims. Nat'l Coalition on Black Civic Participation v. Wohl, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020) (Marrero, J.) (citing Incantalupo v. Lawrence Union Free Sch. Dist. No. 15, 652 F. Supp. 2d 314, 317 n.1 (E.D.N.Y. 2009)). Each party seeking the injunction carries the burden of persuasion and must make "by a clear showing" that the necessary elements are satisfied. Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

### III. DISCUSSION

Syncx's Motion seeks to enjoin Kimedics from using Syncx's data, focused on its customer contacts, without Syncx's consent. Syncx also seeks to restrain Kimedics from

contacting any of Syncx's authorized users, including "clients or placement agency contacts, regarding [Syncx] Data" and from "contacting, soliciting, or engaging any 'Kimedics Exclusive Client.'" (Syncx Mot. at 1-2.)

Kimedics's Motion seeks to enjoin Syncx from using the Syncx Software. Kimedics seeks to restrain Syncx from "developing, marketing, or selling any product or service competitive to or that provides services similar to those provided by Kimedics." (Kimedics OSC at 1.) It also seeks to restrain Syncx from representing that any service provided by Kimedics is the property of Syncx. (See Kimedics Mot. at 1-2.)

Both Motions are based on breaches of various provisions of the Agreements. Insofar as these breaches are concerned, Delaware law controls.[6] In Delaware, to establish a breach of contract, a party much show: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs." Furman v. Enslein, No. 11 Civ. 3793, 2012 WL 3583159, at *4 (S.D.N.Y. Aug. 20, 2012) (quoting Greenstar, LLC v. Heller, 814 F. Supp. 2d 444, 450 (D. Del. 2011)).

---

[6] The MSA Provides, and the parties do not dispute, that Delaware law controls the Agreement. Section 9.1 of the MSA provides that the "Agreement is governed by and construed in accordance with the internal laws of the State of Delaware, without reference to any choice or conflict of law principles or rules." (MSA § 9.1.)

A.   <u>SYNCX'S MOTION</u>

Syncx's Motion is premised upon Kimedics's breach of the Agreements, insofar as Syncx alleges that Kimedics has improperly used Syncx's data to provide services to Syncx's clients and also to contact and purportedly solicit the same customers. Syncx seeks to enjoin Kimedics from using the data input by Syncx and its clients into the Kimedics Platform, and also from using the contact information of Syncx's clients to offer direct services to them. Syncx contends that Kimedics would not have any of that data but for its partnership with Syncx.

1.   <u>Likelihood of Success</u>

Syncx offers three theories for how Kimedics breached the Agreements. First, Syncx argues that Kimedics misappropriated and misused Syncx's Customer Data and Confidential Information, as those terms are defined, by using the data to service Syncx's clients and contacting certain of Syncx's clients during the term of the Agreement. Second, Syncx asserts that Kimedics breached its non-solicitation obligations by offering services to Syncx's clients directly, including *after* the term of the Agreement. Third, Syncx avers that Kimedics forced the termination of the Agreement by citing Syncx's alleged misappropriation of Kimedics's data in creating the Syncx Software so that

Kimedics could solicit Syncx's clients. The Court finds that Syncx is likely to succeed on its first and second theories.

a)   <u>Misappropriation and Misuse of Syncx Data</u>

Syncx is likely to succeed on its claim that Kimedics misappropriated Customer Data, but only after Kimedics terminated the Agreement on June 8, 2023. The MSA defines Customer Data as "all data, material, and other information . . . that is (i) entered or uploaded into the Kimedics Account by [Syncx], or an authorized Affiliate or Client of [Syncx] or their Authorized Users." (MSA § 1.) Kimedics's use of that Customer Data was also restricted by the MSA. Kimedics could only "copy, cache, store, reproduce, process, display, use, distribute, transmit and generally make available Customer Data in electronic form through the Platform solely in order to provide the Kimedics Services to [Syncx] and/or [Syncx's] authorized Affiliates or Clients" and "access Customer Data on the Connected Services solely in order to provide the Kimedics Services." (<u>Id.</u> § 2.5.) Critically, Kimedics could only do so "during the Term." (<u>Id.</u>)

Syncx argues that, during the term, Kimedics violated these provisions by reaching out to Syncx's customers in April 2023 to conduct surveys and on June 2 and June 8, 2023, to provide direct support to Syncx's customers.

The Court is not persuaded that the communications in April and on June 2, 2023 constitute a misappropriation of Customer Data. As Kimedics points out, Sections 10.1 and 2.4 of the MSA incorporate the Kimedics Terms of Use and Privacy Policy ("TOU") and require that each of Syncx's clients and vendors who is authorized to use the Kimedics Platform agree to the TOU. The TOU expressly provides that Kimedics could contact users of the Platform "[t]o provide and maintain the Service"; "to notify [users] about changes to our Service"; "to provide customer care and support"; and to "improve the Service, based on information and feedback." (Counterclaims Ex. 3 at 9-10.) The TOU also expressly provided that Kimedics may "use your information to help us administer a . . . survey." (Id. at 10.) Each of these terms of the TOU directly refer to Kimedics's ability to use data supplied by the users to improve the Kimedics Platform and offer its users customer service and support.

To that end, neither of the April and June 2 emails, which relate to Kimedics's provision of support or customer service to certain of Syncx's clients, constitutes a misappropriation or misuse of Syncx's Customer Data. The April email relates to a survey that Kimedics sent to all customers. This type of contact is expressly authorized by the TOU.

In the June 2 email, Ramsey contacted Gayle Conner, a Physician Recruiter at UPMC, to ensure that UPMC had a "direct line to connect if there is anything at all your organization needs in the upcoming couple of months." (Byington Opp. Decl. Ex. J.) While this email could be read to have a more nefarious motive given the timeline -- Syncx characterizes it as setting the groundwork for the later alleged solicitation of those clients after Kimedics cut-off Syncx's access (see Tr. 23:22-24:23) -- such an objective is not clearly demonstrated here and the email does not establish that Kimedics was doing more than offering to provide *support* as contemplated by the TOU as opposed to directly engaging to offer prohibited services.[7]

While these pre-termination missives are not likely to constitute a breach, however, the Court finds that Syncx is likely to succeed on its claim that Kimedics breached the contract by misusing the Customer Data to contact Syncx's clients on and after June 8, 2023, the date Kimedics

---

[7] Kimedics argues that the TOU allows for almost any kind of contact between Kimedics and Platform users, including those brought on to the Platform by Syncx. While the TOU allows for certain contacts between Kimedics and Syncx's clients during the term for support, the MSA, by its own terms, plainly states that "in the event of a conflict between this Agreement and any such agreement" (and directly referring to the Kimedics Acceptable Use Policy, i.e., the TOU) "the terms of this Agreement shall prevail." (MSA § 10.1.) Thus, to the extent that the TOU allows for some client contact, those contacts are explicitly superseded by the MSA to the extent that they conflict. The TOU is simply not as strong a shield as Kimedics posits.

terminated the Agreements with Syncx. On June 8, 2023, Kimedics's counsel sent Syncx a letter purporting to terminate the Agreements, effective immediately. Later that evening, Kimedics sent an email blast to all of Syncx's clients, including UPMC and OSF, affected by the termination, with the subject line "Kimedics Update-critical changes coming to your account." (Complaint ¶ 59-60.) Kimedics advised those clients that Kimedics had terminated its relationship with Syncx but was allowing those customers to maintain access to the Platform until July 11, 2023 and offered to directly service Syncx's customers. (Id.) By terminating the Agreement, effective immediately, Kimedics's right to "use" Customer Data to "provide the Kimedics Services" to Syncx's "Clients" also terminated immediately, as the plain language of the contract granted Kimedics that right only "during the Term." (See MSA § 2.5.) Syncx has demonstrated, on the record before the Court, that Kimedics used "Customer Data" to provide transitional services to Syncx's clients post-termination, a right it did not have.

In order for Kimedics to provide these transitional services post-termination, Kimedics necessarily needed to use "Customer Data." Kimedics offers no meaningful rebuttal to this argument. Instead, it focuses on the notion that client information and data is owned by the client, not by Syncx.

(See Kimedics Opp. at 10-11 (citing MSA § 2.1 ("Customer (*or its Clients, as applicable*) owns, and shall retain, all right title and interest in and to all Customer Data.")).) But Kimedics's argument misses the point. As Kimedics notes, Customer Data includes all data entered into the Platform by either Syncx or its Clients.[8] Once terminated, Kimedics had no right to access or use that data to provide the Kimedics Services, regardless of who has a property right over it. Indeed, the expectation of the parties was that, upon termination, the parties would work together to remove all Customer Data from the Kimedics Platform, not that Kimedics could continue to maintain, store, and use the information thereafter. (See MSA § 3.4.)

And while Kimedics identifies a carve out in the Amendments that allows Kimedics to contact Kimedics Exclusive Clients to "market[] or sell[] any other features of the Platform," such right did not extend to provision of "any of the Synchronized Services" to such clients. (See Amendment § 4.4.) None of the communications in the record indicate that Kimedics was offering to sell or market *other* features

---

[8] Syncx's main client, UPMC, also expressed dismay that, post-termination, Kimedics would continue to have access to data entered by UPMC on the Kimedics Platform. In an email dated June 12, 2023, a UPMC director stated that "Kimedics['s] unauthorized access to UPMC data" was a "significant risk for UPMC" because "UPMC does not have an executed Agreement with Kimedics directly and neither do [its] agencies." (Ramsey Opp. Decl. Ex. 1 at 2.)

of the Platform. Rather, the communications show that
Kimedics was offering to provide the very services that Syncx
had been providing. (See Hancock Opp. Decl. Ex. 1 at 1-2
(Kimedics offering to generate invoices for UPMC in response
to email from Wade indicating that invoice generation was "a
task the Syncx team completes").)

The Court also finds that certain Customer Data
constitutes Confidential Information, as that term is defined
by the Agreements. Confidential Information includes
"business opportunities, personnel . . . and other sensitive
or proprietary information." (MSA § 8.1.) Kimedics contends
that customer contact information is not Confidential
Information, indeed, it could not be confidential because the
ability of users to contact each other to communicate is the
defining feature of the Kimedics Platform.

Kimedics states that the Agreements "do not contemplate
such information being secure, private, or restricted."
(Kimedics Opp. at 11.) However, Kimedics's TOU undermines
this argument, and, in fact, confirms that Kimedics promised
its users to keep contact information private and
confidential. The TOU represents that Kimedics would collect
certain "personally identifiable information, for example
your name and e-mail address," but that that "private
information will not be sold, exchanged, transferred, or

given to any other company for any reason, without your consent, other than as reasonably necessary to respond to operate the Service and to respond to your requests for information, products, or services, as described in this [TOU]." (Counterclaims Ex. 3 at 9-10.) Further, even if the TOU could be read to allow Kimedics to "use such contact information for its own purposes" under the TOU, (Kimedics Opp. at 13), as discussed above (see Note 7), terms in the TOU that conflict with the MSA are superseded. Thus, the MSA's provisions that make Customer Data Confidential Information override Kimedics's argument (one contradicted by the TOU's own terms) that the data is not private or confidential.

And Kimedics does not show that on-Platform collaboration is equivalent to the unrestricted exchange and use of users' contact information. Even assessing the TOU in isolation, it does not contemplate that Kimedics could employ user data in any way it wanted. Section 2 of the TOU's privacy policy, titled "Use of Information," explicitly contemplates that a user's data "[w]ithin the services" would be used "only for improving the accuracy of data." (Counterclaims Ex. 3 at 10.) Kimedics seeks to rely on certain terms of the TOU but ignores others. Such a pick-and-choose approach is untenable.

Accordingly, Syncx is likely to succeed on its claim that Kimedics used Customer Data, in violation of the

Agreements, based on Kimedics's conduct after terminating the Agreements on June 8, 2023.

> b)   Kimedics's Direct Engagement of Kimedics
>      Exclusive Clients

Syncx's second theory is that Kimedics breached section 4.4 of the Amendment, the non-circumvention language that the parties agreed to. Section 4.4 prohibits Kimedics from "(a) actively encourag[ing] any Person who is a Kimedics Exclusive Client to terminate or adversely alter its relationship with [Syncx] or (b) solicit[ing] or directly engag[ing] any current Kimedics Exclusive Client for Kimedics' direct provision of any Synchronized Services" for a defined period of time. (Amendment § 4.4.) Syncx is also likely to succeed on this claim.

Kimedics counters, first, that none of the parties it contacted constitute a Kimedics Exclusive Client. This is because, Kimedics posits, Byington's declaration avers that although Syncx has an "MSP Exclusive Contract" with its "two main clients" those contracts are not actually "exclusive." (Kimedics Opp. at 18.) The statements that Kimedics highlights are that Syncx will "capture more" of its clients' locum placements, that Syncx anticipated "eventually capturing between 90% and 100% of each client's locums business"; and that Syncx currently "manages approximately

half of the placements for one of its clients and approximately twenty percent of placements for its other client." (Id. (citing Byington Decl. ¶¶ 5, 42).)

Byington's supplemental declaration, submitted in connection with Syncx's Reply and Opposition to Kimedics's Motion, persuasively rebuts Kimedics's argument. Byington declares that, while Syncx does not manage all of its two clients' locum staffing needs, Syncx is their only managed services provider. In other words, Kimedics's focuses its lens incorrectly. Kimedics advances the argument that Syncx must handle all locums staffing for a given client. But Kimedics's aperture is too narrow, bringing too much background into the picture. With a wider opening, it becomes clear that the provisions are focused only on exclusivity as it relates to providing managed services, not on locums staffing in general.

The rationale offered by Syncx is supported by the language of the Amendment. The Amendment provides that a Kimedics Exclusive Client is any healthcare organization that "has entered into an MSP Exclusive Contract." (Amendment § 1.10.) And an "MSP Exclusive Contract" is a "definitive written agreement between [Syncx] and a Healthcare Organization providing for the engagement of [Syncx] as such healthcare organizations exclusive provider of any of the

Synchronized Services," which is further defined as "the provision of the VMS Module and MSP (Managed Service Provider) services." (Id.) So long as Syncx is the exclusive provider of Synchronized Services (i.e., managed services) to its two main clients, then those two clients constitute Kimedics Exclusive Clients subject to the provisions of amended Section 4.4. Syncx has persuasively demonstrated that those two clients, UPMC and OSF, contracted with Syncx exclusively for managed services, rendering them Kimedics Exclusive Clients. Kimedics offers little to rebut that conclusion.

Syncx's argument that Kimedics violated Section 4.4 revolves, primarily, around the email that Kimedics's counsel sent UPMC on June 12, 2023. In that email, Kimedics offered to directly provide UPMC the ability to "run invoices on [UPMC's] end to ensure your doctors are timely paid. Kimedics can also enable invoice generation for your vendors to be able to do this action as well if you request it; likewise, if needed Kimedics can also provide a bulk download on a weekly basis of [UPMC]'s generated pdfs." (Hancock Decl. Ex. 1.)

The invoicing accommodation was made in response to a complaint from Wade, President of UPMC Locum Clinicians. As previously noted, Wade complained that when Kimedics shut Syncx out of the Platform, UPMC lost, among other things, the

ability "to generate invoices for time worked last week (and moving forward)" explaining that invoice generation was a "task that the Syncx team completes." (Hancock Opp. Decl. Ex. 1 at 2.)

The catalyst of the email chain between Kimedics and Wade was Kimedics's email blast to all users affected by the termination of the Agreements. Shortly after that email was sent, Ramsey reached out to Wade to let him know he could reach out to her "directly" so that she could "ensure [he] [got] what [he] need[ed] during this transition period." (Id. at 5.) Wade admonished Ramsey for contacting various of UPMC's employees and explained that UPMC was "already having blowback" from Kimedics's decision to cut off Syncx from the Platform. (Id. at 2-3.) After Wade did not respond to another email from Ramsey's that Kimedics would "keep a direct line open with [Wade] solely," Ramsey followed up later in the day, asking whether Kimedics could provide help on "any data needs or support issues." (Id. at 3.)

The Court is persuaded that this email clearly demonstrates that Kimedics sought to, at least, directly engage UPMC, a Kimedics Exclusive Client, to provide certain of the Synchronized Services that Syncx was providing. That is likely a violation of Section 4.4 of the Amendment.

The engagement is most apparent with respect to Kimedics's accommodation regarding invoicing. UPMC made clear that invoice generation was an MSP service that Syncx was providing for UPMC, making it a Synchronized Service under the broad definition in the Amendment. And while Section 4.4 carves out and allows Kimedics to market and sell *other* features of the Kimedics Platform to Kimedics Exclusive Clients, Kimedics can offer to provide such services only "so long as such offerings are not utilized to provide any of the Synchronized Services to such Kimedics Exclusive Clients." (Amendment § 4.4.) So, while the Court is somewhat skeptical that Kimedics's outreach was for the purposes of soliciting UPMC away from doing business with Syncx,[9] combined with Ramsey's offer to provide any data or other support, Kimedics appears to at least have offered to directly provide services that Syncx had been providing. Such a notion is bolstered by the fact that Kimedics had partially restored Syncx's ability to access the invoice and spend reports. (See Hancock Opp. Decl. Ex. 1 at 1.) If Syncx could provide that service to

---

[9] Syncx rejected such a notion explicitly, showing little concern that UPMC would hire Kimedics to replace Syncx. At the hearing, Syncx made clear that Syncx and Kimedics "do not do the same thing, and they do not offer the same thing, and they do not serve the same universe of customers" and even further that Syncx was "not worried that Kimedics is going to convince these mega hospital systems to replace the services that we provide through 20-plus people with a purely automated system." (Tr. 11:7-9; 14:1-4.)

UPMC, Kimedics's offer to circumvent that is likely a breach of the Agreements' non-circumvention language, that forbid Kimedics from "directly engag[ing]" UPMC for "Kimedics' direct provision of any Synchronized Services." (Amendment § 4.4.)

> c) <u>The Sham Termination</u>

Syncx's third theory is that Kimedics's termination was a sham, serving as pretext to allow Kimedics to, through the forced transition, solicit Syncx's clients. Syncx's argument here is largely a prebuttal of Kimedics's argument, made in its own Motion, that the Syncx Software misappropriates the Kimedics's Platform, in violation of the Agreements. To the extent that Syncx alleges a breach here, it appears based upon the procedure by which Kimedics effectuated the termination.

Syncx argues that Kimedics did not follow the termination procedures by finding that the alleged misappropriation of Kimedics's property was incurable and that Kimedics should not have immediately shut off Syncx's access to the Platform. Syncx says that "nothing in the Agreement permits Kimedics to *immediately* terminate Syncx's subscription." (Syncx Opening Br. at 21.) This argument is belied by the plain terms of Section 3.3 of the MSA. That section provides that "Upon the termination of the

Agreement . . . all of [Syncx's], and its Affiliates', rights
to access and use the Platform shall *immediately* cease." (MSA
§ 3.3 (emphasis added).) Syncx's position here is unavailing
and is unlikely to succeed when constructed as a plain breach
of contract argument.

Syncx raises another possibility, albeit in passing.
That argument is that Kimedics's decision to immediately
terminate Syncx's access, without warning, was
"unconscionable." (Syncx Opening Br. at 21.) Although using
the term "unconscionable," Syncx's argument is more
reasonably read as an appeal to the implied covenant of good
faith and fair dealing, inherent in every Delaware contract.
See Airborn Health, Inc. v. Squid Soap, LP, 984 A.2d 126,
145-46 (Del. Ch. Ct. 2009) ("The implied covenant of good
faith and fair dealing inheres in every contract governed by
Delaware law and 'requires a party in a contractual
relationship to refrain from arbitrary or unreasonable
conduct which has the effect of preventing the other party to
the contract from receiving the fruits of the bargain.'")
(citation omitted).

Such an argument may have viability, although it is not
one of Syncx's grounds for relief claimed in its Complaint.
The MSA leaves undefined and ambiguous how a party is to
determine whether and when a material breach is or is not

"capable of being cured." (MSA § 3.3.) The implied covenant could fill that gap and provide the limits of when a party can unilaterally dictate that a breach is not curable.

There are facts in the record supporting a claim for such a breach of the implied covenant. Syncx points out that, Kimedics now takes issue with Syncx's posts on LinkedIn in which Kimedics says Syncx claimed the Platform as its own. But, at the time those screenshots were posted, Kimedics executives, including Ramsey, complimented the efforts and raised no qualms until this action began. (See Byington Opp. Decl. ¶¶ 11-13.) Likewise, Syncx argues that Kimedics never challenged Syncx's ability to use its own technology when Syncx cited that as its reason for not renewing the Agreements. (Byington Decl. ¶¶ 15-16.) Yet, even with these facts, the argument is raised in only a "single conclusory sentence" and has not been fully developed by either party. Zhang v. Gonzales, 426 F.3d 540, 545 n.7 (2d Cir. 2005); Abdou v. Walker, No. 19 Civ. 1824, 2022 WL 3334700, at *3 (S.D.N.Y. Aug. 12, 2022) ("Undeveloped arguments are waived because 'it is not the obligation of the court to research and construct legal arguments open to parties.'" (quoting Nat'l Fair Hous. All. V. Travelers Indem. Co., 261 F. Supp. 3d 20, 34 n.4 (D.D.C. 2017))). Accordingly, the Court will not sua sponte decide this factor on these grounds where Syncx specifically

disclaims relying on any other theory outside of breach of contract for its Motion. (See Syncx Opening Br. 15 n.5.) Accordingly, the Court does not find that Syncx is likely to succeed on the merits of this claim.

### 2.   Irreparable Harm

Syncx offers three theories on how it has satisfied the element of irreparable harm: (1) that irreparable harm is presumed where a party has misappropriated a trade secret; (2) that Kimedics's solicitation of Syncx's clients has and will imminently harm its goodwill and business relationships; and (3) that the Agreements provide for injunctive relief without proof of irreparable harm based on the disclosure of Confidential Information. The Court finds that Syncx has not compellingly demonstrated irreparable harm.

Irreparable harm is "'the single most important prerequisite for the issuance of a preliminary injunction.'" Reuters Ltd. v. United Press Int'l, 903 F.2d 904, 907 (2d Cir. 1990) (quoting Bell & Howell: Mamiya Co. v. Masel Co. Corp., 719 F.2d 42, 45 (2d Cir. 1983)). Indeed, the Court advised the parties that it was focused on the arguments regarding whether there was irreparable harm. (See Tr. 2:15, 2:21-24, 27:13.) Irreparable harm is an "injury for which a monetary award cannot be adequate compensation." Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (citation omitted).

45

Further, "[i]rreparable harm must be shown by the moving party to be imminent, not remote or speculative." Reuters, 903 F.2d at 907 (citing Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 972 (2d Cir. 1989)). The movant is required to establish not a mere possibility of irreparable harm, but that it is "likely to suffer irreparable harm if equitable relief is denied." JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990) (emphasis in original). "Likelihood sets, of course, a higher standard than 'possibility.'" Id.

   a)   Presumption of Irreparable Harm for Trade
        Secret Misappropriation

Syncx's first theory is that the customer contact information that Kimedics continued to use after it terminated the Agreements is presumed to constitute irreparable harm. Syncx states that "'irreparable harm is presumed where a trade secret has been misappropriated,' and such trade secrets explicitly include information regarding 'customer lists and the identity of client contacts,' and 'customer preferences and needs.'" (Syncx Opening Br. at 21 (citing Johnson Controls, Inc. v. A.P.T. Critical Sys. Inc., 323 F. Supp. 2d 525, 533, 537 (S.D.N.Y. 2004)).) While that may be true, and while the Court may find that Syncx's client contact information could constitute Confidential Information under the Agreement, such material does not necessarily

comprise a trade secret. See, e.g., id. ("[S]imply labeling information as 'confidential' [does not] render it protectable so that its loss results in irreparable harm."); AM Medics Commc'n Grp. v. Kilgallen, 261 F. Supp. 2d 258, 262 (S.D.N.Y. 2003) (access and use of confidential client information does not inexorably lead to a finding of irreparable harm).

Johnson Controls sets forth a six-factor test for whether information constitutes a trade secret. The first of those factors is "the extent to which the information is known outside of the business." Johnson Controls., 323 F. Supp. 2d at 537. That factor is likely dispositive here. To the extent that Syncx argues that its customer contact information constitutes a trade secret because Kimedics would not have had such ease of access but for the relationship with Syncx, that contact information is likely public and could have been discovered by Kimedics outside of the relationship, and is therefore unremarkable. And Syncx did not seek to keep its customers, especially UPMC, a private matter. For example, Syncx readily advertised its relationship with UPMC.

Syncx's argument that the contact information constitutes a trade secret is conclusory at best.[10] Syncx

---

[10] The Court agrees with Syncx that federal law governs the irreparable harm standard as it applies to trade secrets. (See Syncx Reply at 9 (citing Verzani v. Costco Wholesale Corp., 641 F. Supp. 2d 291, 302

makes no attempt to parse the factors of <u>Johnson Controls</u> to
show that the client contact information and customers lists
are trade secrets. (<u>See</u> Syncx Opening Br. at 21.) Thus,
despite the Court explicitly asking whether "the presumption
of irreparable harm for trade secrets case[s]" "under the
<u>Johnson Controls</u> factors" was available "in view of the
various underlying agreements among the parties and
applicable law" (Tr. 2:18-20), Syncx did not address that
question during the hearing as it related to its own contact
information.

    Syncx had to address these issues to establish
entitlement to the presumption of irreparable harm since, in
general, a client list is not presumed to be a trade secret.
<u>See</u> <u>North Atl. Instruments, Inc. v. Haber</u>, 188 F.3d 38, 44-

---

(S.D.N.Y. 2009).). Even so, <u>Johnson Controls</u> applies New York law to
assess what qualifies as a trade secret, and so Syncx's argument does not
address which state law should be applied here to determine if Syncx's
client list and customer information was held as a trade secret. While
the Court assesses the inquiry under the New York standard above, to the
extent that Delaware law applies (<u>see</u> Kimedics Opp. at 20-21), the Court
reaches the same result. The Delaware Uniform Trade Secrets Act ("DUTSA")
defines a trade secret as

    information, including a formula, pattern, compilation, program,
    device, method, technique or process, that: a. Derives independent
    economic value, actual or potential, from not being generally known
    to, and not being readily ascertainable by proper means by, other
    persons who can obtain economic value from its disclosure or use;
    and b. Is the subject of efforts that are reasonable under the
    circumstances to maintain its secrecy.

DUTSA § 2001. The contact information that Kimedics used appears "readily
ascertainable by proper means" and Syncx did not take reasonable efforts
to maintain any secrecy that UPMC was a client. Thus, the Court finds
Syncx has not satisfied the definition of a trade secret under either New
York or Delaware law.

45 (2d Cir. 1999). "The question of whether or not a customer list is a trade secret is generally a question of fact." A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 89 (2d Cir. 1991). Syncx needed to show that the client contact information was "difficult to duplicate," North Atl. Instruments, 188 F.3d at 46, or that it took great time and effort to compile the information, Webcraft Techs., Inc. v. McCaw, 674 F. Supp. 1039, 1044 (S.D.N.Y. 1987), or that "the customers are not known in the trade or are discoverable only by extraordinary efforts." Leo Silfen, Inc. v. Cream, 278 N.E.2d 636, 640 (N.Y. 1972). Syncx did not set forth any facts supporting such a finding at this preliminary juncture. The Court will not presume irreparable harm in this circumstance as Syncx has not persuasively demonstrated that the information constitutes a trade secret.

      b)    Damage to Business Reputation and Goodwill

Syncx's second theory is that, absent a preliminary injunction, its business relationships and goodwill have been and will continue to be harmed. Syncx's evidence here is primarily based on the email from UPMC's Wade, discussed in detail above. Syncx posits that this email, which was sent amidst the turmoil caused by Kimedics's sudden termination of the contract, presents strong evidence that Kimedics will continue to contact and solicit Syncx's clients. (See

Byington Decl. ¶ 60 ("Kimedics has expressed no interest in ceasing its use of our data for its own purposes.").)

While the evidence of Kimedics's outreach to UPMC was sufficient to establish the likelihood of Kimedics's breach of contract, it is not sufficient to establish imminent irreparable harm beyond mere speculation. Kimedics represents in its Opposition that "Kimedics has not and does not intend to solicit that business." (Kimedics Opp. at 22.) And while this statement may simply express a litigation position, Byington also declares that "compared to Kimedics, [Syncx] tend[s] to service different clients." (Byington Opp. Decl. ¶ 23.) And as noted above, Syncx is "not worried that Kimedics is going to convince these mega hospital systems to replace the services that [Syncx] provide[s]." (Tr. 14:1-3.)

So, as the Court inquired at oral argument, "where is the beef"? (Id. 13:8.) Syncx finds the beef in its contention that because of the business disruption caused by Kimedics cutting Syncx off from the Kimedics Platform, Syncx remains on the razors edge with its two largest (and, apparently, only) clients, UPMC and OSF. Further, Syncx asserts that any further disruption by Kimedics could jeopardize not only those relationships, but Syncx's very existence. Yet, Syncx does not show that it has so lost its business reputation with its own clients that it "might be destroyed entirely

without a preliminary injunction." <u>C.D.S. Inc. v. Bradley</u> <u>Zetler, CDS, LLC</u>, 691 F. App'x 33, 35 (2d Cir. 2017). Rather, the exchange between Wade and Kimedics's counsel, the evidence on which Syncx primarily relies, shows that UPMC was unhappy not with Syncx, but with Kimedics. And while Byington characterizes the email as a "nightmare" and posits that it appeared "amateurish" to Syncx's client, (Byington Decl. ¶¶ 54, 56), such speculation as to UPMC's view of Syncx does not sufficiently establish irreparable harm.

The Court's conclusion is bolstered by the fact that Syncx has launched the Syncx Software and has been able to continue to provide services to UMPC and OSF. <u>Cf.</u> <u>Rex Med.</u> <u>L.P. v. Angiotech Pharma (US), Inc.</u>, 754 F. Supp. 2d 616, 621 (S.D.N.Y. 2010) ("Typically, cases where courts have found irreparable harm from a loss of goodwill or business relationships have involved situations where the dispute between the parties leaves one party unable to provide its product to its customers."); (Tr. 6:6-17 (explaining that Syncx was able to "roll out their new software" and "continue providing services to their customers")). Syncx has not raised any further possibility of harm arising from Kimedics's conduct. UPMC and OSF both continue to do business with Syncx. And other than self-serving declarations that Syncx's relationship with those clients is fragile, Syncx

also has not compellingly expressed fear that either of its clients would leave its side for Kimedics. Syncx's second theory of irreparable harm fails.

c)   Presumption of Irreparable Harm for Disclosure of Confidential Information

Finally, Syncx argues that, under Section 8.4 of the MSA it is "entitled to injunctive relief . . . without proof of irreparable harm" due to Kimedics's misuse of the Customer Data. This argument also fails. The plain language of the contract makes clear that the entitlement to injunctive relief without proof of irreparable harm is available only where "Confidential Information is, or is threatened to be, disclosed." (Amendment § 8.4.) Syncx does not strongly demonstrate that Kimedics is threatening to or has disclosed Syncx's Confidential Information, only that Kimedics has inappropriately used it internally.[11] This provision of the MSA unambiguously does not include the internal "use" of Confidential Information as a trigger to the presumption of irreparable harm. Accordingly, Syncx's reliance on this provision fails.

---

[11] Such a view accords with the plain meaning of disclose, which is defined as "to make known or public" or "to expose to view." Disclose, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/disclose. It would create a conflict to read the provision as being triggered by inappropriate internal use, in context of the entire contract, where Kimedics was allowed to, albeit in a limited fashion, use Syncx's Confidential Information.

3.   Balance of the Equities and Public Interest

While the Court finds that the equities weigh in Syncx's and the public's favor, and that Kimedics would experience no hardship if it were enjoined as Syncx seeks, Syncx's failure to demonstrate it will suffer irreparable harm is dispositive of its Motion. Accordingly, the Court does not further address this factor.

* * * * *

For the reasons stated above, the Court denies Syncx's motion for a preliminary injunction. While, in this posture and preliminary stage, Syncx has shown that it is likely to succeed on the merits of some of its breach of contract claims, Syncx fails to adequately establish that, without the restraint of an injunction, it will imminently suffer irreparable harm. Kimedics's conduct during the transition period was less than stellar, but that transition period is over and Kimedics represents that it has no interest in further contact with Syncx's clients. The Court thus denies Syncx's Motion.

B.   KIMEDICS'S MOTION

Kimedics seeks, through its Motion, to enjoin Syncx from using the Syncx Software to service its clients. Kimedics also seeks to restrain Syncx from representing that any service provided by Kimedics is or belongs to Syncx. For the

53

reasons that follow, and under the standard articulated above,[12] the Court also denies Kimedics's Motion.

1. <u>Likelihood of Success</u>

Kimedics's Motion is based upon two alleged breaches of the Agreements: (1) Syncx's misappropriation of Kimedics's goodwill through the promotion of Syncx's proprietary software, which was actually the Kimedics Platform; and (2) the development and launch of the Syncx Software, which Kimedics contends was achieved through a misappropriation of Kimedics Data, a term defined by the Agreements. Kimedics is not likely to succeed on either of its claims.

a) <u>Misappropriation of Kimedics's Goodwill</u>

One of the breaches that Kimedics identifies is that Syncx misappropriated Kimedics's goodwill by claiming that the Kimedics Platform was owned by Syncx. Kimedics's strongest evidence for this claim revolves around the "case study" that Syncx posted to its website, although other examples are referenced. In the promotional materials for the "case study," Syncx represented that "[i]n October of 2021,

---

[12] Syncx argues that the Court should review Kimedics's Motion under the heightened standard for a "mandatory injunction," which requires the moving party to, in circumstances where it seeks to "modify the status quo," "make a strong showing of irreparable harm and demonstrate a clear or substantial likelihood of success on the merits." <u>A.H. ex rel Hester v. French</u>, 985 F.3d 165, 176 (2d Cir. 2021). As Kimedics fails to meet its burden under the lower standard, the Court need not decide whether the heightened standard applies.

UPMC re-launched its internal locum float pool, this time on the *Syncx Float Pool platform*. With *Syncx proprietary software*, the process became automated, streamlined, and intuitive, allowing for an organization-wide view of available physicians and their locations." (Counterclaims Ex. E at 1 (emphasis added).) However, in 2021, Syncx was partnered with Kimedics under the Agreements, and the proprietary software that Syncx employed to service UPMC was, in fact, the Kimedics Platform.

Under the Amendments, Syncx agreed that it would not "represent, state, proclaim, assert or otherwise imply, suggest or maintain that the Platform of any Kimedics Services are owned by, or otherwise are the exclusive technology of, [Syncx], including, but not limited to, any statements or claims that the Platform or any Kimedics Services are the proprietary technology of [Syncx]." (Amendment § 4.7.) Syncx's claim in the "case study" is a straightforward breach of that obligation.

However, Kimedics does not argue that this breach was incurable, and it flip-flops on whether the breach served as the basis for terminating Kimedics's relationship with Syncx. The "case study" issue arose only on June 9 (a day after Kimedics sent its notice of termination to Syncx) in an email between the parties' outside counsel. In that email,

Kimedics's counsel noted that "MSP's material breaches extend beyond its misappropriation of Kimedics's IP. For instance, despite the exclusivity language in Section 3.6 of the MSA, and section 4.7 of the [Amendments] . . . your client has stated in multiple fora . . . that its product constitutes 'proprietary' technology." (Peluso Opp. Decl. Ex. 3 at 4.) During the hearing, however, Kimedics's counsel averred that the "case study" "is what led to the termination of the contract." (Tr. 36:18-37:12 ("This [referring to the case study] is what led to the termination of the contract.").) Once Syncx recognized what reference Kimedics's counsel was referring to, Syncx immediately cured the breach by removing the "case study" from online, and when Kimedics identified in its briefing that the pdf link still existed despite being removed from Syncx's website, Syncx removed the pdf, too. (See Byington Opp. Decl. ¶¶ 15-16.)

Although Kimedics now argues that the "case study" led to the termination, in raising these issues only after the termination and in its Counterclaims and its Motion, Kimedics failed to abide by the notice and cure provisions of the Agreements. As a matter of law, Kimedics is unlikely to succeed on these claims due to that failure. Delaware law recognizes that "contractual notice and cure provisions cannot be ignored no matter how urgently parties may seek to

do so when prosecuting breach claims in litigation." Cornell Glasgow, LLC v. LaGrange Properties, LLC, No. C.A. N11C-05-016, 2012 WL 6840625, at *13 (Del. Super. Ct. Dec. 7, 2012) (collecting cases). While the Agreements do contain a pre-suit cure obligation, the MSA does contain the pre-termination cure requirement. That provision requires that before a party can terminate the Agreement based on a material breach, it must give "30 days" to cure the breach before terminating, if that breach is "capable of being cured." (Shaener Decl. § 3.2.)

Although not noted in Kimedics's June 8 letter that purported to serve as its notice of breach and the basis for its termination under that provision, Kimedics now further justifies its termination based on Syncx's claim in the "case study." This is unavailing. Kimedics was obligated to allow Syncx the opportunity to cure these breaches (breaches that Syncx did, in fact, cure)[13] before citing them as an alternative basis for its immediate termination of the

---

[13] The Court gleans from Kimedics's suggestion, although noted in connection with its irreparable harm argument, that these posts are incurable breaches because "once it's on the internet it's there forever." (Tr. 47:7-8.) Though the Court does not doubt the wisdom of this point as it was offered at oral argument, primarily as a caveat counsel tells his teenage daughters (id.), Kimedics offers no evidence to rebut Byington's declaration that Syncx has taken several steps to remove the post from the Internet. The Court attempted to access the case study at the URL provided by Kimedics, but found only a 404 Error, a shorthand indication that the page has been removed entirely.

contract. Cf. AMG Vanadium LLC v. Global Adv. Metals U.S.A., Inc., C.A. No. N17C-03-1637, 2020 WL 1233752, at *11 (Del. Super. Ct. Feb. 6, 2020) (explaining that a termination provision with a cure requirement is only inoperative where the contract has been repudiated).

Kimedics also argues that the case study and other posts caused consumer confusion about the relationship between Syncx and Kimedics. Kimedics states that the posts "caused the phone calls to Ms. Ramsey saying what the hell is going on?"[14] (Tr. 47:11-12.) According to Kimedics, Ms. Ramsey received calls asking, "did you sell, what's going on, I thought that was your software." (Id. 45:15-16.) Kimedics, however, offers no evidence of these calls occurring, which customers were confused by Syncx's posts, or how or when they were confused. And Ramsey makes no declaration that she actually received those calls from customers indicating their confusion. Without more, the Court has no obligation, in this posture of the case, to accept Kimedics's allegations as true. Wohl, 498 F. Supp. 3d at 469.

---

[14] Kimedics raises this point in its Opening Brief -- "Kimedics has already received calls from both current and potential customers expressing concern arising from Syncx's claims and their resulting confusion about the relationship between Kimedics and Syncx" (Kimedics Opening Br. at 22) -- as well as its Counterclaims -- "multiple third parties, including current and prospective customers of Kimedics, have communicated to Kimedics their confusion regarding the nature of the relationship between Kimedics and Syncx" (Counterclaims ¶ 76).

Syncx also persuasively rebutted this argument at the Court's preliminary injunction proceeding. None of Syncx's posts mentioned its relationship with Kimedics by name and "the only people who could have possibly known that that was a reference to Kimedics were the people [UPMC and OSF] who had used the Kimedics systems through Syncx." (Tr. 56:12-14.) Without evidence beyond attorney argument at this stage, the Court agrees with Syncx that "[n]o one would understand [Syncx's posts] to be a reference to Kimedics." (Id. 56:17.)

Ultimately, Kimedics does not claim that these breaches were incurable. And Syncx did cure whatever breaches Kimedics has noticed. Further, as explained below, Syncx may describe its own software as proprietary without breaching the Amendments. Kimedics has not sufficiently demonstrated that it is likely to succeed on its claims that Syncx breached the Agreement by misappropriating Kimedics's goodwill.

b)   Misappropriation of the Kimedics Platform

Kimedics's second theory of breach is that Syncx misappropriated Kimedics technology, primarily the Kimedics Platform, when it developed and launched the Syncx Software. Kimedics claims that this violated Syncx's obligations under Section 2.6 of the MSA, which prohibits Syncx from using "the Kimedics Data for the purposes of developing, directly or indirectly, any product or service competitive to the

Platform." (MSA § 2.6.) Kimedics argues that the Syncx Software uses a "combination of vendor management, scheduling, and float pool management [that] mirrors the unique differentiating functions of the vendor management, scheduling, and float pool management solution offered by the Kimedics [P]latform." (Kimedics Opening Br. at 19.)

Kimedics can be successful on proving this theory of breach, at this stage, only if it can strongly demonstrate that Syncx used the "Kimedics Data" to develop the Syncx Software. Kimedics has not carried that burden, and the Court finds it unlikely that Kimedics would succeed on the merits of its claim.

Syncx and Kimedics offer competing interpretations for the breadth of protection over the Kimedics Platform under the Agreements. Under Delaware law, the Agreements "must [] be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'" Sunline Commercial Carriers, Inc. v. CITGO Pet. Corp., 206 A.3d 836, 846 (Del. 2019). The Court finds that Syncx has the more persuasive reading of the protections over the Kimedics Platform.

Syncx construes the Agreements in a way that gives effect to each provision of the contract and is not the remarkably broad reading that Kimedics offers. (See Syncx Opp. at 15-16

(citing <u>Osborn ex rel. Osborn v. Kemp</u>, 991 A.2d 1153, 1160 (Del. 2010) (declining to credit an interpretation that "produces absurd results or that no reasonable person would have accepted when entering the contract")).) To begin, the Agreements define Kimedics Data broadly to include "all data, material, documentation, source code, object code, underlying structure, ideas, algorithms, and other information comprising the Platform." (MSA § 1.) The unambiguous language of this provision limits the Kimedics Data to that "comprising the Platform." (<u>Id.</u>)

The "Platform" is also a defined term. It includes "Kimedics' *proprietary* utilization management software accessed by [Syncx]." (<u>Id.</u> (emphasis added).) Thus, the natural reading of those defined terms together is that the "data, material, documentation, source code, object code, underlying structure, ideas, algorithms, and other information" is limited to the "proprietary" features of the Platform. (<u>Id.</u>)

The Agreements do not stop there, and the Court must go one level deeper. Under the Confidentiality provisions of Section 8 of the MSA, "sensitive and proprietary information" is considered "Confidential Information." (<u>Id.</u> § 8.1.) Reading these provisions all together, the Kimedics Data would constitute Confidential Information.

Another route to this conclusion is the one offered by Kimedics. The definition of Kimedics Data includes the defined term Intellectual Property, which is also included within the definition of Confidential Information. (See Tr. 41:17-43:16.) No matter the path, the Agreements unambiguously indicate that the parties expected that Kimedics Data would be treated as Confidential Information.

That said, the MSA provides an explicit carve out for what does *not* embody Confidential Information, i.e., is *not* Kimedics Data. Excluded from that definition is any information that "(i) is or becomes generally available to the public other than as a result of wrongful disclosure by the receiving party; (ii) is already known by the receiving party, by means not subject to a confidentiality obligation owed to the disclosing party, . . . ; or (iv) is developed independently by the receiving party without use of any of the disclosing party's Confidential Information and by persons without access to such Confidential Information." (MSA § 8.1.) Under the most natural and logical reading of the Agreements, then, Syncx may use any non-Confidential Information to develop competing software.

Such a construction, that Syncx was able to develop its own software as long as it was independent of any of Kimedics's proprietary and Confidential data, accords with

Delaware law. "In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract . . . situated in the commercial context between the parties." <u>Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.</u>, 166 A.3d 912, 913-914, 926-928, 932 (Del. 2017).

The commercial context between the parties is key here. As the parties articulated during their oral argument, Syncx and Kimedics do not offer the exact same services. Kimedics offers a software subscription to the Platform. Subscribers are then able to manage their own business internally. Syncx does not sell software. Instead, as an MSP, Syncx used the Kimedics Platform as "a tool" to do all of the administrative tasks Syncx's clients would otherwise have to do themselves. (Tr. 12:2-25.)

Syncx, however, cannot provide such managed services to its clients without underlying software, like the Kimedics Platform. When Syncx entered into the Agreement with Kimedics, it was for only a three-year term. And while the parties could renew the contract after the initial term, the expectation was that the relationship could have a definite end. Because Syncx cannot offer its services without the underlying software, it would belie the commercial realties of the transaction and the context between the parties to

find that Syncx was prohibited from ever developing software
that mirrored any of the ideas encompassed with the Kimedics
Platform for use after the Agreement's term ended. Doing so
could limit Syncx's ability to continue as a company, and
reading into the contract such a broad restrictive covenant
is insufficiently supported here. See Kan-Di-Ki, LLC v. Suer,
C.A. No. 7937, 2015 WL 4503210, at *19 (Del. Ch. July 22,
2015) (restrictive covenants must be reasonable and advance
a legitimate economic interest).

Moreover, Syncx argues persuasively that it developed
its Syncx Software based on a mélange of well- and broadly-
known public information and ideas regarding locums placement
software in the industry. Syncx cites several competitive
software platforms that have many of the same features that
Kimedics asserts are unique to its Platform (i.e., vendor
management and float pool management with organization-wide
visibility). (See Syncx Opp. 13-14.) For example, AMN
Healthcare offers "vendor and float pool management"
solutions that it promotes as "the glue that holds all
critical systems together." (Shaener Opp. Decl. Ex. E.)
Another, called Aya Healthcare and Aya Connect, is marketed
as "a client's total workforce partner" powering "the full
scope of [its partner's] workforce programs including
contingent labor, permanent staff hiring, internal resource

pool management and ongoing workforce optimization." (Id. Ex. F.) Aya Connect is bolstered as "the only healthcare staffing platform connecting healthcare facility clients to clinicians and suppliers at scale." (Id.) Yet another, QGenda, promotes its product as "consolidat[ing] systems to simply maintenance and reduce costs," "streamlin[ing] the scheduling process with proven automation tools," and "engag[ing] physicians, nurses, and staff" as well as working "across your department or enterprise." (Id. Ex. G.) Each of these systems makes promotional claims that are eerily similar to the supposedly unique systems that the Kimedics Platform promotes.

Kimedics purports to rebut that contention by citing to a recorded business review meeting between Kimedics and Syncx in April 2023, well into Syncx's development of the Syncx Software, during which a Syncx representative stated that there is "no other technology that does" what Kimedics does in offering a comprehensive set of collaborative features. (See Kimedics Reply at 4.) But the mere recognition that Kimedics offered a comprehensive one-stop shop for medical staffing, while competitors had more piecemeal offerings, does not sufficiently show, without more, that Syncx accessed anything proprietary to Kimedics to build the Syncx Software.

Kimedics again counters that the actual processes and design of the Syncx Software is a copy of the Kimedics

Platform. Although not submitted with its papers,[15] during the hearing Kimedics presented a side-by-side video comparison of the Kimedics Platform and the Syncx Software. That comparison showed two similar looking calendar programs in which users were able to easily add information to the calendar. Kimedics characterized the Syncx Software and Platform as "very similar," "[i]ndistinguishable almost," because users can do everything in "one simple stroke." (Tr. 37:19, 38:10.) Such an ability was distinct from competitors where there is a multistep process and not all of the data "gets back to the calendar." (Id. 38:16-17.)

On their face, the user interfaces and experience may appear similar. But similarity alone does not win the day for Kimedics. Rather, Kimedics must show that Kimedics Data (proprietary and confidential ideas, designs, etc.) was used

---

[15] Syncx notes that Kimedics's failure to provide the Court with any evidence allowing it to compare the products is determinative of whether Syncx misappropriated Kimedics Data. Kimedics indicated that it did not submit evidence of the Kimedics Platform to avoid "putting [] screenshots and [Ramsey's] design in the public record." (Tr. 39:10-14.) In other words, Kimedics sought to avoid publicly revealing information it has sought to keep confidential: the design and functionality of the Kimedics Platform. Kimedics sought to present that material during the oral argument so as to avoid a public paper trail and protect its interest. Kimedics's strategy impedes, somewhat, the Court's ability to accurately measure the similarities and differences between the parties' competing products. And Kimedics was not without remedy. It could have sought permission to file such confidential information under seal, as parties often do. Either way, as discussed above, the Court's review of the evidence presented suggests only non-proprietary surface-level similarities insufficient to establish a likelihood of breach of contract at this phase.

to develop the Syncx Software. The side-by-side comparison does not establish that.

And the evidence offered by Syncx shows that similarities between the Syncx Software and the Kimedics Platform abound in other competitors' software as well. Aya Connect shows a float pool management platform with a calendar that has easily readable data. (See Shaener Opp. Decl. Ex. F at 3.) So too do the QGenda (id. Ex. G at 5) and Healthcare Workforce Logistics (id. Ex. H at 10) materials. Indeed, the Court's own scheduling system, although used for entirely different purposes, reflects similar data entry and scheduling processes. As the Court noted during the oral argument, it could not "honestly say that you're showing me these two pictures and [] can detect that there are similarities or differences, as you represent." (Tr. 39:6-7)

Although Kimedics argues that Syncx could not have created such similar processes without referencing the Kimedics Platform, i.e., without looking under the tent, Syncx's declarations undermine that position. The President of the Nuage Group, Jason Bodie, whose team developed the Syncx Software and who was personally involved in overseeing the project, declared that the Syncx Software was developed in conjunction with Syncx stakeholders as a custom build. Bodie states that Nuage was "never asked to replicate or

reverse engineer any features from the Kimedics [P]latform" and that no one on his team "used the Kimedics software, website, or any other Kimedics created materials as a basis for the work building and developing the Syncx Software." (Bodie Decl. ¶ 9.)

Ultimately, Kimedics may show, through discovery, that Syncx did, in fact, use its access to Kimedics's proprietary data to develop the Syncx Software. However, at this preliminary stage, and on the record before the Court, Kimedics has failed to carry its burden regarding this point.

2. <u>Irreparable Harm</u>

Kimedics also fails to show it will be irreparably harmed absent an injunction. Kimedics Opening Brief argues that it is irreparably harmed by Syncx's passing on the goodwill of Kimedics in its promotional materials. But as described above, the Court finds that Syncx has cured its breaches relating to the misappropriation of Kimedics's goodwill and that it is unlikely that any customer would be confused by the relationship between Syncx and Kimedics.

Kimedics's Motion can also be read as a complaint that any future representation by Syncx that the Syncx Software is "proprietary" is also misappropriation of Kimedics's goodwill. That circumstance obtains because the Syncx Software misappropriates Kimedics Data. The Court also finds

that argument fails. As described above, Kimedics has not yet shown on this record that the Syncx Software misappropriates anything of Kimedics that is proprietary or Confidential, as defined in the MSA. And while Kimedics represents that it has received calls expressing concern and confusion over the relationship between Syncx and Kimedics, as already discussed, it provides no declaration to that effect and cites no substantiating evidence. Nor has Kimedics shown that Syncx and Kimedics actually compete for the same customers such that Syncx claiming Kimedics's product would draw business away from Kimedics to Syncx. And Syncx declares that it has not received any business from the promotional materials Kimedics claims manifest a breach. (See, e.g., Byington Opp. Decl. ¶ 17.) The Court is not persuaded by Kimedics's position.

Likewise, Kimedics offers no support for its contention that it will suffer irreparable harm due to increased competition from the Syncx Software. Kimedics presents no legal support for the proposition that that increased competition from Syncx alone would constitute irreparable harm. Further, it appears undisputed that Syncx and Kimedics do not compete in the same healthcare management market for the same core business. (Byington Decl. ¶¶ 22-25.) That Syncx might sell against some of Kimedics's competitors now that it

can offer its own software does not, in and of itself, suggest that Kimedics and Syncx will compete for those same clients. Indeed, Syncx offers several instances of Syncx referring clients to Kimedics, as late as March 2023, where Syncx's managed services product was not the right fit and where Kimedics's self-service software might be more suitable. (See Byington Decl. Exs. G, F.)

Kimedics also claims that the MSA presumes an injunction will issue based on Syncx's use of Confidential Information under Sections 2.6 and 8.4, which provide for injunctive relief without proof of irreparable harm. But as described above, Kimedics is not likely to succeed on its claims that Syncx breached those provisions and so it cannot rely on them for the presumption of irreparable harm.

Finally, Kimedics has not shown that monetary damages would be insufficient. For example, if Kimedics eventually proves that Syncx misappropriated proprietary Kimedics Data to build the Syncx Software, then Syncx may owe Kimedics a royalty or other calculable monetary damages for that misappropriation. Syncx's counsel agreed that were Kimedics to prevail on its claims, "they can get damages" and that "[t]his will be the easiest damages case the Court has ever had." (Tr. 59:5-7.) The Court will not assume that such ease will present itself in the long run, but agrees with Syncx

70

that damages for misappropriation of such data to sell software services are possible to calculate.

Kimedics has not shown that it will suffer irreparable harm absent an injunction.

### 3.  Balancing the Equities

Unlike in Syncx's Motion, the injunction that Kimedics seeks would impose a substantial hardship on the nonmovant. Were the Court to enjoin Syncx from using the Syncx Software, Syncx has persuasively shown that its business would be destroyed. Syncx states that if enjoined, Syncx would be "forced to cease operations entirely and lay off its twenty-five full time employees." (Syncx Opp. at 23-24.) Kimedics offers no real rejoinder to this assertion. It claims that such hardship is a "knowing and voluntary" result of Syncx's willful breach. (Kimedics Opening Br. at 23.) And in Reply, Kimedics instead focuses on the provisions in the contract relating to the posting of bond should the injunction issue. (See Kimedics Reply at 8-9.) The Court finds that not allowing Syncx to use the Syncx Software would impose a substantial hardship and jeopardize its business. Accordingly, the equities weigh in Syncx's favor and countenance against issuing Kimedics's desired injunction.

## IV.   <u>ORDER</u>

For the foregoing reasons it is hereby

**ORDERED** that the motion (Dkt. No. 9) for a preliminary injunction brought by Syncx LLC f/k/a MSP Synchronized Solutions ("Syncx") is **DENIED**; and it is further

**ORDERED** that the temporary restraining order (Dkt. No. 20) imposed, on consent, is **DISSOLVED**; and it is further

**ORDERED** that the motion (Dkt. No. 29) for a preliminary injunction brought by Kimedics Inc. ("Kimedics") is **DENIED**; and it is further

**ORDERED** that the parties, having filed a Complaint (Dkt. No. 1), and Answer to the Complaint with Counterclaims (Dkt. No. 28), and an Answer to the Counterclaims (Dkt. No. 48), are hereby directed to submit a joint letter, within fourteen (14) days of the date of this Order, addressing the following in separate paragraphs: (1) a brief description of the case, including the key remaining factual and legal bases for the claim(s) and defense(s), including a description of what discovery is required; (2) any contemplated motions; (3) the prospect for settlement; and (4) whether the parties consent to proceed for all purposes before the Magistrate Judge designated for this action.

The parties are also directed to submit a proposed Case Management Plan that provides that discovery is to be

completed within four months unless otherwise permitted by the Court. A model Case Management Plan is available on the Court's website: https://nysd.uscourts.gov/hon-victor marrero. The parties are directed to propose, as part of the proposed Case Management Plan, a date for a case management conference, if necessary, within two weeks of the close of fact discovery.


**SO ORDERED.**

Dated:    10 August 2023
          New York, New York

                                    _____
                                              Victor Marrero
                                                 U.S.D.J.